# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| MARCELINO ALVAREZ-VICTORIANO,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>CITY OF WATERLOO, et al.,<br><br>　　　　Defendants. | No. C23-2035-LTS-MAR<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

## I.　INTRODUCTION

This matter is before me on a motion (Doc. 42) for summary judgment filed by defendants City of Waterloo (the City) and CJ Nichols (Nichols). Plaintiff Marcelino Alvarez-Victoriano (Alvarez) has filed a resistance (Doc. 47) and defendants have filed a reply (Doc. 51). Oral argument is not necessary. *See* Local Rule 7(c).

## II.　PROCEDURAL HISTORY

On March 16, 2023, Alvarez commenced this action by filing a petition (Doc. 2) in the Iowa District Court for Black Hawk County. The initial petition named asserted claims of excessive force under Article I, section 8 of the Iowa Constitution against both defendants (Count 1), negligence under Iowa law against both defendants (Count 2) and a federal constitutional violation under 42 U.S.C. § 1983 against Nichols (Count 3).

On April 28, 2023, defendants filed a notice (Doc. 1) of removal to this court based on federal question jurisdiction pursuant to 28 U.S.C. § 1331. Alvarez subsequently filed an amended complaint (Doc. 20) in which he added factual allegations and seemingly withdrew his Iowa claims, focusing instead on his federal constitutional claims brought pursuant to § 1983. Defendants filed an answer (Doc. 28) denying the

allegations and asserting various affirmative defenses, including qualified immunity. Trial is scheduled to begin September 16, 2024.

### III. APPLICABLE STANDARDS

#### A. *Summary Judgment Standards*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

2

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

B. *Section 1983 Standards*

42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be

3

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

§ 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, 42 U.S.C. § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393-94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "One cannot go into court and claim a 'violation of [42 U.S.C.] § 1983' — for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (§ 1983 "merely provides a method for vindicating federal rights elsewhere conferred."); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution.). To state a claim under § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

While § 1983 authorizes claims against a "person," the Supreme Court has described the conditions under which a local governmental entity may be sued under § 1983:

> We conclude . . . that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

4

*Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 694 (1978).

### C. Qualified Immunity Standards

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (citation omitted). The court is permitted to use its discretion in deciding which prong of the qualified immunity analysis to address first. *Pearson v. Callahan* 555 U.S. 223, 236 (2009).

Whether an officer is entitled to qualified immunity is a fact-dependent inquiry. The Supreme Court has explained:

> The first step in assessing the constitutionality of [the officers'] actions is to determine the relevant facts. As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury, and respondent's version of events (unsurprisingly) differs substantially from [the officers'] version. When things are in such a posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting the plaintiff's version of the facts.

*Scott v. Harris*, 550 U.S. 372, 377 (2007) (internal citations omitted). In *Scott*, the lower court had accepted the plaintiff's version of the events. However, the Supreme Court clarified that the plaintiff-friendly summary judgment standard does not require courts to ignore contrary evidence: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. The Eighth Circuit Court of Appeals has noted that video recordings may serve as one source of evidence that blatantly contradicts a party's version of events for purposes of the qualified immunity analysis. *Peterson v. Heinen*, 89 F.4th 628, 633 (8th Cir. 2023).

5

### 1. Violation of a Federal Statutory or Constitutional Right

Excessive force claims against police officers should be analyzed as seizures "under the fourth amendment and its 'reasonableness' standard." *Graham v. Connor* 490 U.S. 386, 395 (1989).

> The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. [*Graham v. Connor*, 490 U.S. 386, 397 (1989)]. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. *Id.* at 396.

*Malone v. Hinman*, 847 F.3d 949, 952 (8th Cir. 2017) (citation omitted). "This calculus allows for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citation omitted).

The Eighth Circuit has described when it is reasonable for an officer to use deadly force against a suspect:

> "The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012), citing *Garner*, 471 U.S. at 11, 105 S. Ct. 1694. "[N]o constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon." *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001) (per curiam). "As the Supreme Court has explicitly said, use of deadly force is permissible when the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Id., citing *Garner*, 471 U.S. at 3, 105 S. Ct. 1694.

*Smith v. Kilgore*, 926 F.3d 479, 486-87 (8th Cir. 2019).

### *2.    Whether the Right is Clearly Established*

For the "clearly established" prong of the qualified immunity analysis:

> A legal principle must have a sufficiently clear foundation in then-existing precedent. Normally this requires us – outside of an "obvious" constitutional violation – "to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). While the case need not be "directly on point, existing precedent must place the lawfulness of the particular [act] beyond debate." *Wesby*, 138 S. Ct. at 590.

*Johnson v. City of Minneapolis*, 901 F.3d 963, 972 (8th Cir. 2018) (internal citations cleaned up). Put another way, "[f]or a right to be 'clearly established,' the law must have been sufficiently clear to put every reasonable official on notice that what he was doing violated that right." *Cole ex rel. Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020). Thus, courts "look to existing precedent that involves 'similar facts' and that 'squarely governs the specific facts at issue.'" *Id.*

### IV.    RELEVANT FACTS

Unless otherwise noted, the parties do not dispute the following facts:

This case arises from a police encounter that lasted less than three minutes in the early morning hours of April 7, 2021. On that date, a 911 caller reported that a man, later identified as Alvarez, was walking on Commercial Street towards downtown Waterloo with a rifle or shotgun. Ex. H. Nichols, a Waterloo police officer, was advised of the situation while he was at the scene of a motor vehicle accident. Ex. G at 49:47 to 49:56. Nichols left the scene of the accident and drove towards Alvarez's location. *Id.* at 49:56-53:08. While en route, Nichols again heard a report of a man carrying a rifle

or shotgun. *Id.* at 51:13-51:27. Dispatch further reported that Alvarez was on the Sixth Street bridge and had a "10-32" that was a rifle. *Id.* at 52:37-52:53.

Before Nichols reached Alvarez's location, Black Hawk County Sheriff's Deputy Blake Dodd arrived on scene at the intersection of West Sixth and Commercial Streets.[1] Ex. E at 12:44 to 12:50. Alvarez was standing next to a concrete wall by the side of the road. *Id.* at 12:50. A skinny black object was laying on top of the wall. *Id.*; Ex. D at 00:55-01:10. As Dodd exited his vehicle, he identified the object near Alvarez as a rifle. Ex. D at 02:17-02:30. Alvarez then picked up the rifle, brandished it at Dodd and started walking towards him.[2] Ex. E at 12:50-13:20; Ex. D at 03:22-4:00. Dodd drew his service weapon and ducked behind the rear driver-side of his vehicle for cover. Ex. D. at 04:00-04:23. Dodd ordered Alvarez to put the gun down. *Id.* at 04:27-04:31. Alvarez responded with something that Dodd did not understand in which Dodd described as an aggressive "come get something" tone.[3] *Id.* at 04:47-05:35. Dodd then notified dispatch that Alvarez had a gun. *Id.* at 05:27-05:32. Dodd raised his head saw that Alvarez had the gun at waist level and returned to cover. *Id.* at 05:30-05:41. Dodd then notified dispatch that the gun was a rifle. *Id.* at 05:41-05:46.

Dodd noticed that Alvarez was coming to the driver's side of Dodd's vehicle. *Id.* at 05:45-05:48. In response, Dodd moved to the passenger's side. *Id.* There is a dispute as to whether Alvarez was chasing Dodd around the vehicle. Defendants claim that

---

[1] Alvarez denies that Dodd arrived on scene while Nichols was en route because defendants miscite the timestamp in Dodd's DCI interview. However, the entire encounter took less than three minutes and Nichols' commute between the scene of the first accident to the scene of the event in question took longer than three minutes. These facts suggest that Dodd mostly likely arrived while Nichols was en route.

[2] While Alvarez disagrees that he was walking towards Dodd, Dodd's dashcam shows Alvarez brandishing his rifle at Dodd's vehicle as it pulls up. The footage then shows Alvarez walking towards the vehicle.

[3] Alvarez denies he used an aggressive tone. The description in the statement of facts is about Dodd's perception of Alvarez's tone.

8

Alvarez was "seeking [Dodd] out." Ex. I at 02:45. Alvarez claims he was just trying to walk home. Ex. B at p. 31 line 3-24.

As Alvarez was walking around Dodd's vehicle, Black Hawk County Sheriff's Deputy Matthew Isley arrived on scene. Ex. F at 03:01-03:03. Isley swerved his vehicle in an attempt to hit Alvarez but missed. *Id.* at 03:03-03:05. As Isley passed by, Alvarez pointed the weapon at him.[4] *Id.* Isley then can be heard over the radio saying "hit him." Ex. I at 3:15. Dodd later stated to DCI investigators that, after Isley passed Alvarez, Dodd looked up and "immediately had a gun in [his] face." Ex. D at 7:16-7:34.

Nichols arrived on scene seconds after Isley's arrival.[5] He observed Isley's vehicle's reverse lights activated and movement around Dodd's vehicle. Ex. C at 32:22-25. Nichols later stated to DCI investigators that he perceived that Alvarez's weapon was a shotgun and that Alvarez was "hunting [Dodd] around the vehicle." Ex. C 34:12-24. He believed that Alvarez was going to shoot Dodd in front of him because Alvarez's gun's "muzzle was even with the ground pointed in Dodd's general direction with the stock underneath his armpit, consistent with somebody preparing to engage." Ex. C at 35:8-10; 35:19-23. Nichols discharged his service rifle at Alvarez through the windshield of his vehicle. Ex. C at 36:18-20; Ex. G at 53:08. The shot struck Alvarez and he fell to the ground. Ex. C at 36:21-24. After Nichols exited his vehicle, one of the other officers ordered Alvarez to put his gun down. Ex. G at 53:12. Alvarez then raised his right arm from a prone position, raising his gun with it.[6] Ex. G at 53:16-53:20. Nichols

---

[4] Alvarez states that he does not remember pointing the gun at Isley. However, Isley's dashcam footage depicts Alvarez pointing his weapon at Isley.

[5] The short timeframe between Isley's arrival and Nichols' arrival is determined from comparing the dashcam footage of all three officers. Isley put his car in reverse within seconds of arriving on scene and Nichols' dashcam footage depicts this as Nichols arrived on scene.

[6] While Alvarez disputes the accuracy of Nichols' bodycam footage, the video shows Alvarez raising his weapon.

9

then fired five more shots at Alvarez, stumbling backwards in the process.[7] *Id.* at 53:19-53:22.

Dodd approached Alvarez and kicked the gun away. Ex. D at 20:18-20:22. As Dodd and Isley were putting Alvarez in handcuffs, Nichols approached and identified the weapon as a BB gun. Ex. C at 39:3-12. The BB gun did not have an orange tip or other visual indicator that it was not a gun capable of inflicting deadly force. Ex. B at 40:17-20. Nor did Alvarez tell any of the officers who responded to the scene that the gun was not capable of inflicting deadly force. *Id.* at 40:21-24.

Alvarez was taken to the hospital. The Iowa DCI investigative report indicates that Alvarez suffered from three gunshot wounds. As a result of the shooting, Alvarez was left paralyzed from the waist down. *Id.* at 47:13-16.

## V. ANALYSIS

### A. *Defendants' Arguments*

Defendants contend Nichols did not deprive Alvarez of any constitutional or statutory right because Nichols' use of deadly force was reasonable. Defendants argue Nichols applied the proper amount of force to stop Alvarez from pursuing Dodd with what officers at the scene reasonably believed was a gun that appeared to be real and capable of inflicting deadly force. Defendants cite *Aipperspach v. McInerney*, 963 F. Supp. 2d 901 (W.D. Mo. 2013), a case in which officers searching for a suspect found him sitting in a ravine. *Id.* at 904. When the officers asked the suspect to come up and talk with them, he "produced what . . . appeared to be a handgun held against his jaw." *Id.* The officers believed the gun to be real but it was actually a BB gun. *Id.* at 904-05. The officers ordered him to drop the gun. *Id.* at 905. The suspect fell backwards as he tried to change his seating position, and when he pulled himself up, he pointed his gun at

---

[7] While Nichols does not remember how many shots he fired, five shots can be heard on Nichols' bodycam footage.

several officers. *Id.* In response, multiple officers discharged their weapons at the suspect, killing him. *Id.* The suspect's estate then brought a § 1983 action against the officers. The district court granted summary judgment in favor of the defendants, finding that they were entitled to qualified immunity because their use of deadly force was objectively reasonable. *Id.* at 907-09.

The Eighth Circuit affirmed, concluding the officers did not violate the suspect's Fourth Amendment rights when they shot him. *Aipperspach v. McInerney*, 766 F.3d 803, 804 (8th Cir. 2014). Although the plaintiff attempted to demonstrate a genuine dispute of material fact by offering video evidence from a helicopter at the scene, the court noted that this evidence, at most, supported inferences about the suspect's subjective intent. *Id.* at 808. The evidence did not contradict the officers' objectively reasonable belief in a "tense, uncertain, and rapidly evolving situation" that the suspect's "actions posed an immediate threat of serious physical harm to the officers." *Id.* at 808.

Defendants also rely on the report of Kenneth Wallentine, a use of force expert, to support their contention that Nichols' use of force was reasonable. Wallentine opines that the force used by Nichols was consistent with accepted law enforcement policies, practices, and training. Wallentine concludes that Nichols reasonably perceived that a deadly attack on Dodd and Isley was imminent after witnessing Alvarez "hunting [Dodd] around the vehicle." Wallentine also states that Dodd was at a tactical disadvantage with limited cover. Wallentine asserts that Nichols' decision to fire five additional rounds at Alvarez was reasonable because Alvarez rolled onto his left side, grabbed the gun and pointed it at Nichols.

Defendants further argue that even if Nichols arguably deprived Alvarez of a constitutional or statutory right, that right was not clearly established in 2021. They contend that even if Nichols was mistaken in his belief that he was justified in using deadly force, that mistake was reasonable. That is, at the very least Nichols had "arguable probable cause," if not "actual probable cause."

11

Finally, defendants argue that Alvarez's claims against the City of Waterloo must fail. Defendants point out that a theory of respondeat superior is not sufficient to impose § 1983 liability on a governmental entity and that Alvarez has failed to show a direct causal link between the City's policies and Nichols' actions.

### B. *Alvarez's Arguments*

Alvarez contends Nichols is not entitled to qualified immunity because his use of force was unreasonable. Alvarez claims that Nichols did not evaluate the totality of the circumstances as they existed on April 7, 2021, and did not consider the seriousness of the crime alleged, if any, whether Alvarez was resisting and the immediacy of the threat to officers and others. To support this argument, Alvarez argues that the 911 call did not give Nichols incontrovertible evidence that Alvarez was committing a crime other than the fact that Alvarez had a gun, nor did Nichols receive any other information before arriving on the scene that that provided a justification for using deadly force. Alvarez points out that in Nichols' interview with DCI, Nichols alleged that Alvarez was pointing his weapon at Dodd. However, Dodd claimed he had no idea where Alvarez was, nor did he say, "I saw him pointing a weapon at me."

Alvarez also argues that he did not pose an immediate threat of physical harm to himself or others because the evidence supports a reasonable inference that Alvarez did not point his weapon at Dodd. Alvarez claims Nichols had already decided he was going to be in a gunfight before he arrived at the scene. He points to Isley's and Dodd's interview with DCI, during which both denied seeing Alvarez when the shots were fired. Further, Alvarez argues that he was shot in the back but if Alvarez was aiming the weapon at Dodd when Nichols shot Alvarez, then Dodd would have been in Nichols' line of fire.

Alvarez relies on the report of W. Ken Katsaris, an expert in assessing police use of force, to support his contention that Alvarez posed no immediate threat. Katsaris opines that none of the officers at the scene faced an immediate threat because, by the time Nichols arrived at the scene, Dodd had taken cover and Isley could no longer see

Alvarez. Kataris opines that Alvarez had his back turned to Nichols by pointing out that the medical records show Alvarez was shot in the back. Katsaris also points out that Nichols was experiencing "Visual Distortion," and "Perceptual Distortion" because Nichols could not hear his own shots. Katsaris concludes that Nichols, by not properly assessing the situation before applying deadly force, did not follow constitutional standards and did not comply with the Waterloo Police Department's policy.

Alvarez asserts that the third factor for an officer to consider when evaluating the totality of the circumstances, whether the suspect is evading capture, supports his contention that Nichols' use of force was unreasonable. Alvarez argues that while the initial evidence purports to show that he was evading arrest; however, Alvarez, who has a limited ability to speak English, did not understand the command to lower his weapon.[8]

Finally, Alvarez claims that his right to be free from excessive force under the Eighth and Fourteenth Amendment is clearly established by caselaw. Alvarez uses the same argument described above, that Nichols' use of force was not objectively reasonable.[9]

## C. Discussion
### 1. *Excessive Force Claims Against Nichols*

As a matter of law, based on the record before me, Nichols did not deprive Alvarez of a federal statutory or constitutional right because Nichols' use of deadly force was objectively reasonable. When evaluating the totality of the circumstances, a reasonable

---

[8] Because Alvarez's argument is not exactly clear, I have phrased it as best as I can understand it.

[9] Alvarez asserts that the analysis for whether a right is clearly established is the same as whether an officer's actions are objectively reasonable. However, Alvarez cites no authority for this contention. The case he cites merely states that an officer can have a mistaken belief if that mistake is objectively reasonable. *See Brown v. City of St. Louis*, 40 F.4th 895, 902 (8th Cir. 2022).

officer in Nichols' position would have perceived that Alvarez posed a "real and immediate threat" to Dodd and Isley. Dodd's and Isley's dashcam videos show Alvarez pointing his gun at each officer as they arrive on scene and following Dodd around Dodd's vehicle with a gun. In Nichols' interview with DCI, he stated that when he arrived on scene, he perceived that Alvarez was "hunting" Dodd with a gun. While Alvarez is not visible on Nichols' dashcam footage at the moment of the shooting, Alvarez's actions leading up to the shooting, and Dodd's and Isley's interviews with DCI, are consistent with Nichols' statement and an objectively reasonable belief in the necessity of using deadly force. Even if Dodd was in a position of cover at the time Nichols fired his weapon, Alvarez, by following Dodd around the vehicle, demonstrated that a reasonable officer would believe Alvarez posed a deadly threat to Dodd. To hold otherwise would put officers in the perilous position of having to wait until suspects have lined up a clear shot at officers before applying deadly force.

Nichols' use of deadly force after he exited his vehicle was also objectively reasonable. Contrary to Alvarez's contention that the video record is not accurate, the video record shows Alvarez raising his weapon as he is on the ground. Ex. G at 53:16 to 53:20. This action would give a reasonable officer in Nichols' position the perception that Alvarez still posed a deadly threat to Nichols and the other officers on scene.

Though Nichols was mistaken in his belief that the BB gun was an actual firearm, this mistake was reasonable. Like the officers in *Aipperspach*, all three officers at the scene in this case had no reason to believe that the weapon was not capable of inflicting deadly force. The gun had no markings that indicated it was merely a BB gun and, with Dodd's life in apparent imminent danger, Nichols did not have time to verify that it was a firearm. This rapidly-evolving situation in which Nichols was faced with a split-second decision about whether to use deadly force is precisely the type of situation the qualified immunity doctrine is intended to address.

Alvarez's evidence fails to create a genuine issue of material fact. His assertions that Nichols decided he was going to be in a gunfight before arriving on scene, that Dodd

14

and Isley did not know where Alvarez was at the time of the shooting, and that Alvarez was merely trying to go home are not material to whether Nichols is entitled to qualified immunity. The question is whether a reasonable officer in Nichols' position would be justified in using deadly force.[10] Even if all of Alvarez's assertions are true, they do not address what a reasonable officer's perception of the situation would be at the time of the shooting. Nor do they overcome the unambiguous video evidence of the incident.

Katsaris' argument that Nichols' use of force was unreasonable because of Nichols' visual and perceptual distortions is also unconvincing. The video record and officer testimony shows Alvarez was apparently pursuing Dodd around Dodd's vehicle with a weapon. Even if Nichols could not hear his shots, Nichols was justified in using deadly force in responding to this threat. Nor does the fact that Alvarez was shot in the back create a genuine issue of material fact. While Alvarez had his backed turned to Nichols, Alvarez's apparent immediate threat to other officers on the scene provided Nichols with the justification to use deadly force.

Because Nichols did not violate a constitutional right, I need not address the second qualified immunity prong. As a matter of law, Nichols is entitled to qualified immunity.

### 2. *Alvarez's Claim Against the City of Waterloo*

Because Nichols is entitled to qualified immunity, Alvarez's claim against the City of Waterloo also fails. *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc) ("This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." (citation omitted)). Even if Nichols was not entitled to qualified

---

[10] Alvarez also cites Dodd's description of Alvarez's movements towards Dodd in the DCI interview as "ring around the rosey," "do si do," "shimmy and shake," and "hide and seek." While Alvarez does not provide an argument directly addressing Dodd's description, Alvarez implies that these terms are innocuous. However, they do not signify that Alvarez's movements were not threatening.

15

immunity, Alvarez has failed to present evidence of any official policy or custom that would lead to City of Waterloo's liability for Nichols' actions. *See Monell*, 436 U.S. at 694.

## VI. CONCLUSION

For the reasons set forth herein, defendants' motion (Doc. 42) for summary judgment is **granted**. Judgment **shall enter** in favor of defendants and against the plaintiff. The trial of this case, currently scheduled to begin September 16, 2024, is **canceled**. The Clerk of Court shall **close this case.**

**IT IS SO ORDERED** this 22nd day of July, 2024.

_____
Leonard T. Strand
United States District Judge